IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2003 Session

## BYRON M. EDWARDS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Blount County**
**No. C-11808     D. Kelly Thomas, Judge**

_____

**No. E2002-00343-CCA-R3-PC**
**May 5, 2003**
_____

Byron M. Edwards appeals the denial of his petition for post-conviction relief attacking his jury conviction for aggravated robbery and for which he was sentenced to 30 years. He argues that he received ineffective assistance of counsel in connection with a plea offer by the state that he rejected. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE JJ., joined.

Maurice Briere, Knoxville, Tennessee, for the Appellant, Byron M. Edwards.

Paul G. Summers, Attorney General & Reporter; Peter M. Coughlan, Assistant Attorney General; Michael L. Flynn, District Attorney General; Edward P. Bailey, Jr., Assistant District Attorney General; and Kirk Andrews, Assistant District Attorney General.

### OPINION

Byron M. Edwards was convicted by a Blount County jury of aggravated robbery, reckless endangerment, and driving under the influence. Tenn. Code Ann. §§ 39-13-103, -402, (1997), 55-10-401 (1993). The convictions stem from a brutal altercation on the evening of May 21, 1996, at the Howe Street Park in Alcoa. The petitioner and a male companion assaulted Wade Nichols and took his personal belongings. The petitioner's aggravated robbery conviction and his 30-year sentence as a career offender were affirmed on appeal. *State v. Byron M. Edwards*, No. 03C01-9812-CC-00436 (Tenn. Crim. App., Knoxville, Feb. 2, 2000) (petitioner did not appeal the two other convictions or sentences).

The relevant underlying facts are set forth in the earlier opinion, from which we quote.

At approximately 6:00 pm on the evening of May 21, 1996, Wade Nichols met his friends, Willie Lundy and Victor Hodge, at the Howe Street Park in Alcoa. While the three men were talking, two vehicles drove up to the men and stopped. One vehicle was driven by the [petitioner]. The [petitioner] was accompanied by Arthur "A.C." Copeland, the co-defendant. The [petitioner] and "A.C." exited their vehicle. . . . The [petitioner] walked toward the three men and ordered them to "lay it down." The [petitioner], thinking that Nichols had made a comment about him, questioned Nichols as to what he said. Nichols responded "I didn't say anything to you, I don't want any problems with you." Nichols then turned his back and reinitiated his conversation with Lundy. At this point, the [petitioner] handed "A.C." his wallet and announced that "he was going to fade this nigger." The [petitioner] then "struck [Nichols] from behind on the right side of [his] face." Nichols' glasses fell to the ground and [Nichols] turned to face him and that's when Arthur Copeland . . ." "tackled [him]." . . . When the beating subsided, "A.C." asked Nichols "where the money was and where the dope was." The [petitioner] then "walked away," "picked up a dirt clod . . . and hit [Nichols] in the back of the head with it." . . . "A.C." took from Nichols' person a pager, a pocketknife, and two hundred dollars. "A.C." opened the knife and "threatened to stick [Nichols] in [the] throat with it." The [petitioner] did not remove any of the items from Nichols' possession nor did the [petitioner] threaten [Nichols] with a weapon or verbally. While Nichols remained face down on the ground, the [petitioner] and "A.C." fled the scene. . . .

Meanwhile, frightened that "[Wade Nichols] was going to get killed," Willie Lundy and Lamont Martin, another bystander, went to the police department to obtain assistance. . . . Officer Simerly, accompanied by Officer Buddy Cooper, got in his patrol car and drove toward the park. As they approached the park, the officers observed the [petitioner] driving his vehicle in the opposite direction. Officer Simerly activated his patrol car's emergency equipment and initiated pursuit of the [petitioner's] vehicle. The [petitioner] failed to stop his vehicle. . . . Eventually, the officers were able to stop the [petitioner's] vehicle.

Upon apprehending the [petitioner], Officer Simerly observed that the [petitioner] "was real glassy-eyed, his eyes were bloodshot, and just rambling on about himself, talking continuously." . . . When questioned about the incident at Howe Street Park, the [petitioner] responded, "Damn right, I robbed them, I'm going to rob all those

> bitches, including Stacy.". . . The deputies recovered "eight hundred
> and seventy dollars in currency" from the person of the [petitioner].

*Byron M. Edwards*, slip op. at 2-5 (footnote omitted).

Initially, the petitioner filed a *pro se* post-conviction relief petition.[1] That petition was amended once with the assistance of counsel. As amended, the petition alleged ineffective assistance of counsel in connection with the pretrial investigation of the case and the jury instructions given at trial. During the evidentiary hearing in December 2001, the state consented to the petitioner adding and litigating an additional complaint that his trial counsel was ineffective in not fully advising the petitioner about a plea offer from the state. An order amending the petition to include the latter complaint was entered after the hearing concluded.

## I. Post-Conviction Hearing and Court's Ruling

The petitioner called his trial counsel to testify at the hearing. Counsel said that he was appointed to represent the petitioner after indictment. He described the petitioner as a "very cooperative client," who responded to requests for information and assisted in speaking with potential witnesses. Regarding the petitioner's intellectual capabilities, counsel said that he "found Mr. Edwards to be bright, articulate" and that the petitioner "seemed reasonably knowledgeable concerning the legal system." Indeed, counsel testified that he "never had any sense that [the petitioner] was, quote, a babe in the woods, concerning any of the matters that we were dealing with." Counsel testified that he remembered the petitioner having an extensive prior criminal history.

Although not reflected in counsel's notes in the petitioner's case file, counsel said that he clearly recalled receiving an offer from the state early in the case for a nine-year sentence.[2] Counsel testified that he discussed the plea offer three or four times with the petitioner. Counsel never sent a letter to the petitioner advising him of the offer in writing, but he insisted that he discussed the matter with the petitioner. Regarding the conversations about the plea, counsel related that he would remind the petitioner about the offer, at which point the petitioner would become agitated and upset, and the petitioner would insist that the offer was "outrageous because he hadn't

---

[1] The *pro se* petition was filed on June 9, 1999, eight months before the court's opinion affirming the conviction and sentence was released. Nothing in the record before us indicates that the premature post-conviction filing was ever noticed or addressed. The post-conviction court, on June 21, 1999, appointed counsel and entered an order finding that the petition presented a colorable claim. More than a year later and after the petitioner's conviction and sentence were affirmed on appeal, the post-conviction court entered an order substituting counsel to represent the petitioner. Thereafter, post-conviction proceedings resumed in a timely fashion.

[2] Counsel's testimony that the state's offer was for a nine-year sentence was disputed by the petitioner and the petitioner's subsequent counsel, who believed that the offer was for a ten-year sentence. We do not regard the discrepancy as significant.

done anything that would merit any kind of sentence like that." Counsel said that he would remind the petitioner of problems with his defense and that he would encourage the petitioner to consider the offer because of the consequences in the event of a jury guilty verdict.

When asked to describe the "problems" with the petitioner's case, counsel testified that he was concerned that, in the best light, the petitioner would be convicted of aiding and abetting. According to counsel, the petitioner's position was that his companion was the one who robbed Mr. Nichols; the petitioner claimed to be extremely intoxicated at the time, but the petitioner candidly admitted to counsel that he had seriously injured Mr. Nichols. Another problem was that the petitioner was not in a position to testify in his own defense in light of his extensive prior record, which included selling cocaine near a school.

One possible line of defense involved eliciting exculpatory testimony from the petitioner's companion and severed co-defendant, Copeland. Counsel said that he was skeptical that Copeland would accept full blame but that it was not impossible. In fact, counsel testified that he was able to get the petitioner's trial date continued more than once in the hope that Copeland's charges would be resolved before the petitioner had to go to trial.

Counsel summed up the situation as essentially having no affirmative defense and hoping for a conviction on some lesser-included offense. From notices filed by the state, counsel said that it was obvious that the state was seeking to enhance any sentence based on the petitioner's prior record. Ultimately, after the petitioner was found guilty by a jury of aggravated robbery, he was sentenced to thirty years as a career offender, with a release eligibility date set at 60 percent.

Counsel said that after three or four times, attempts to discuss the plea offer with the petitioner became "redundant." Counsel admitted that he never discussed the offer with the petitioner in any great detail, but he attributed the level of communication to the petitioner's agitation, recalcitrance, and insistence that he had really done nothing to justify a nine-year sentence. When counsel was pressed for the details of his conversations, he said that he recalled telling the petitioner that if convicted he could get a "lengthy sentence." Counsel did not remember discussing any specific number of years with the petitioner, but he was certain that he communicated to the petitioner that he would get much more than the nine years that the state was offering.

Although counsel testified that he felt that the petitioner should have accepted the state's offer, he said that it was his practice not to "break" a client's "arm" to accept a proposal. Considering that counsel regarded the petitioner as intelligent, counsel said that he did not view his obligation as "essentially put[ting] a gun to his head to get him to take a plea offer." Counsel was satisfied that going into trial, the petitioner was aware, from discovery and the preliminary hearing, what the testimony and evidence against him would be. Counsel described his own attitude as being "pessimistic" as to the outcome of a trial.

The post-conviction court asked if counsel made any counteroffer to the state, and counsel said that he had not. He testified that although the petitioner indicated that he would plead

-4-

to simple assault, he did not "bother to make that offer in any sort of serious way," because never in his "wildest dreams" would he have imagined that the state would have accepted such an offer. Nor did counsel discuss with the petitioner the possibility of a "best interest" plea.

Counsel was asked about an issue that arose at trial during the victim's testimony. The implication was that something happened that should have required counsel to become a witness. Counsel disagreed. He testified that the victim was as "cooperative" on cross-examination as could have been hoped; in fact, on redirect examination, the state attempted to declare the victim a hostile witness to impeach his cross-examination testimony. An exchange with the witness ensued with both the state and the defense examining the victim about a prior written statement to law enforcement and his preliminary hearing testimony.

Counsel related that he first met the victim in prosecution counsel's office. He recalled being surprised by the opportunity of talking with the victim. Counsel said that he was also surprised by the victim's cooperative attitude and lack of hostility. Counsel wanted, if possible, to distance the petitioner from the conduct of co-defendant Copeland, particularly in connection with the robbery. Counsel said that the victim was cooperative on cross-examination in that regard, so much so that the state tried to impeach him with prior statements to the effect that "they" had robbed him.

Counsel admitted that he did not tape record his conversation with the victim. Nonetheless, counsel insisted that the victim's cross-examination testimony was consistent with what the victim had related in the prosecutor's office. Counsel asked the victim about the conversation, and the victim affirmed the truth of the information he had given in that discussion. Counsel said that, under the circumstances, there was no reason for him to be a witness to the victim's statements because the victim admitted what he had said.

Even, however, with the victim's helpful testimony, counsel explained that the underlying problems with the case remained, such as the petitioner's responsibility for aiding and abetting or conspiracy.

The petitioner testified in support of his claims for relief, and he began by saying that he did not recall much about a conversation with trial counsel concerning a plea. The petitioner related that he felt as if counsel "left the burden on [his] shoulders" to pursue the investigation. The petitioner claimed that the first meeting with counsel occurred "months" after counsel was appointed to represent him.

The petitioner said that the first meeting lasted approximately fifteen minutes, and counsel gave him a court date. At the next meeting, the petitioner and counsel talked about the underlying facts and possible witnesses but little else. The petitioner said at the third meeting, counsel was attempting to define a motive to construct a defense theory. The petitioner maintained that he did not understand what counsel was talking about. "I didn't know nothing about a motive," the petitioner testified. "You know what I'm saying, I didn't never graduate, you know, out of

school, so I didn't know what the motive was at the time." Regarding his education, the petitioner related that he completed the eighth grade and afterwards was sent to Taft Youth Center for behavior problems.

The petitioner said that he was unaware whether counsel ever spoke with any witnesses in his case. The petitioner estimated that he met with counsel perhaps a total of six times in two years. The petitioner said that counsel never contacted him by telephone; rather, they would schedule appointments when there were court appearances. In terms of discussions about trial preparation, the petitioner testified that counsel "presented to [him] like he was – he had everything under control and he was ready for trial."

The petitioner admitted that counsel told him about an offer of ten years from the state. The petitioner complained that counsel never explained if the offer was for ten consecutive years, what the percentage of service would be, or if ten years meant ten calendar years. According to the petitioner, counsel simply communicated the offer and told the petitioner he could accept it or go to trial. Regarding the outcome at trial, the petitioner said that counsel "presented" that he "could beat it, more of he could win the case." The petitioner denied that counsel ever talked about the problems with the case if it went to trial. The petitioner maintained that the reason he did not accept the plea was that counsel "never really explained to [him] what the outcome would be, how I would serve the ten years."

Eventually, the petitioner explained his feelings about the charges. Just as counsel had related in his testimony, the petitioner said that he did not believe that he deserved ten years because he did not commit a robbery. The petitioner claimed that counsel made no recommendation about the offer, never explained sentencing ranges to him, and never advised him of the possible sentence if convicted. Then, according to the petitioner, at trial counsel told him that "it could be worse" if there was a conviction and that the case was "going underwater."

The post-conviction court interrupted the testimony and asked the petitioner if he knew what charges had been brought. The petitioner indicated that he did, and he named the offenses. The petitioner also confirmed for the court that he had previous federal convictions. The petitioner became evasive and non-responsive when the court inquired whether he had ever asked counsel how long the sentence for aggravated robbery could be. The petitioner again mentioned the plea offer and said that the only time counsel inquired about his criminal history was at their first meeting. The court tried several more times to determine whether the petitioner ever asked about the possible penalties if convicted. The petitioner's answers became more and more convoluted, and he kept referring to the state's offer of ten years. The last exchange between the court and the petitioner is as follows.

**THE COURT:** He said ten years to everything?

**THE PETITIONER:** Yeah.

-6-

**THE COURT:** That's what you'd get if you pled and that's what you'd get if you didn't plead –

**THE PETITIONER:** That's about –

**THE COURT:** – if you were convicted?

**THE PETITIONER:** He didn't really state about – he just said ten years. He said I could get some more time if I was found guilty.

. . . .

**THE COURT:** Okay. And I'm just having a hard time understanding why you wouldn't want to know what's the worst thing that could happen to you if you had a jury trial and got convicted.

**THE PETITIONER:** Yes, I did ask him. I asked him about all those charges.

. . . .

**THE COURT:** He just said you could get more than ten years?

**THE PETITIONER:** Yeah.

**THE COURT:** And that was it?

**THE PETITIONER:** Yeah, that was it.

A similarly difficult exchange took place when the court asked if the petitioner had talked to counsel about making a counteroffer to the state. The petitioner was not responsive. The court asked if the petitioner had ever talked with counsel about the chances of success at trial. That question prompted the petitioner to say that at "one point, he was more like he had everything under control," but that a couple of days into the trial, "he was more like, chances look slim."

The post-conviction court tried another approach and inquired if it was true that the petitioner had refused to talk to counsel about a plea to aggravated robbery. The petitioner first responded, "No, that's not true." Then, he testified that he refused to accept the plea offer because he had not committed a robbery. Later, the petitioner maintained that he "probably would have took

the ten years" if he had been made aware of his career offender status and the resulting sentencing consequences. On cross-examination by the state, the petitioner settled on the position that he would have pleaded guilty to "11/29" for simple assault, but nothing more.

The final post-conviction witness was attorney Joe Costner, who had defended criminal cases at the state and federal levels for numerous years. He was called as a witness for the petitioner regarding the range of competence demanded of attorneys in criminal cases. Mr. Costner, moreover, served as the petitioner's new-trial and appellate attorney on the aggravated robbery conviction.

Mr. Costner testified that on an intellectual capability scale of one to ten, the petitioner was below average, at three or four. Mr. Costner said that when he first interviewed the petitioner after the guilty verdict, Mr. Costner was unable "to get a sense" of what had happened. Mr. Costner testified that over time, it was "just obvious" that the petitioner "had a below-average ability to comprehend" legal matters. For that reason, Mr. Costner explained that he spent a lot of time with the petitioner to ensure that the petitioner understood his rights and defenses.

Mr. Costner opined that given the gravity of the charges and the petitioner's limited understanding, an attorney would need to spend far more than the average amount of time conferring with the client. From discussions with the petitioner, Mr. Costner formed the impression that the petitioner never understood that he had virtually no chance of winning the case and that, at a minimum, he would be convicted of aggravated assault. Also, given the petitioner's six prior federal convictions, no doubt existed about the petitioner's career-offender status.

Mr. Costner summed up the bleak circumstances surrounding the case. The victim was going to testify, and the defense had no credible witnesses to contradict the victim's account. Two other men present at the scene were going to testify as eyewitnesses to the events. The state had inculpatory statements that the petitioner made to the police when apprehended, and the petitioner's criminal history precluded him from testifying at trial. Furthermore, the victim's injuries were substantial. Mr. Costner testified that in his opinion, the petitioner did not understand the negative impact of those circumstances and was not advised that he had no viable defense. Mr. Costner said that he understood that the state had extended an offer of ten years, as a Range II offender, with a 35-percent release eligibility date.

To provide effective assistance of counsel in a situation such as confronted the petitioner, Mr. Costner said that the attorney should primarily try to ensure that the client understands what is being communicated. Essentially, Mr. Costner took the position that it can take a long time and require multiple explanations before a client, such as the petitioner, can digest and accept that the case cannot be won. Mr. Costner was asked about an attorney's duty relative to a plea offer. He testified that the offer should be communicated quickly in writing to get it documented. The attorney then should compare the offer to the client's potential exposure if convicted at trial.

Mr. Costner said that in his experience, most clients do not understand sentencing

concepts expressed to them in terms such as Range II at 35 percent. An offer, according to Mr. Costner, should be explained in "real terms, practical terms" and then contrasted with the likely result if the offer is not accepted. To be convinced that a client finally understands the situation, Mr. Costner requires the client to recite back the information in a way comprehensible to a lay person. As for a client who understands an offer, such as made to the petitioner, but refuses to accept it, Mr. Costner testified that he "would seriously consider telling him that I'm going to have to withdraw because you and I are not able to communicate." That tactic, Mr. Costner elaborated, can sometimes have a beneficial "shock" value such that the client begins to listen and appreciate the seriousness of the situation.

In terms of the petitioner's situation, Mr. Costner said that it was apparent to him that the petitioner did not understand what he was facing. By that remark, Mr. Costner explained that the petitioner did not understand that he had virtually no chance to win the case; he did not understand what a career offender was; he did not understand the range of punishment if convicted and the release eligibility percentage applicable to career offenders. In the petitioner's case, Mr. Costner did not believe that threatening to withdraw as counsel would have been necessary; Mr. Costner testified that it "was just a matter of spending more time" with the petitioner.

Because Mr. Costner had handled the petitioner's earlier appeal, he was familiar with what happened at trial. Mr. Costner recalled that it appeared that trial counsel had put himself in a position that might require him to be a witness. The victim gave trial testimony that Mr. Costner viewed as contrary to information conveyed to trial counsel at a meeting in prosecution counsel's office. In Mr. Costner's opinion, trial counsel should have brought an investigator or tape recorder to the meeting. Nonetheless, Mr. Costner also admitted that regardless whether the conversation had been recorded, it would not have reasonably affected the outcome of the trial.

At the conclusion of the hearing, the post-conviction court identified the only viable, disputed issue to be the extent to which defense counsel needs to go to convince an unwilling client to accept a plea offer.[3] The court issued oral findings and conclusions before the hearing adjourned, and an order dismissing the petition was entered on January 14, 2002.

The post-conviction court found that the petitioner understood the charges that had been lodged against him and that he understood that the state had offered a nine- or ten-year plea agreement. The court said that the proof showed that the petitioner refused to admit guilt to the aggravated robbery charge because he insisted that all he did was get into a fight and assault the victim. The court credited counsel's testimony that he attempted to talk to the petitioner about the plea, but "was not able to discuss it with [the petitioner] because [the petitioner] refused to talk about it and would get mad when it was brought up." The court elaborated and concluded as follows:

So, if [the petitioner] did not understand things about the

---

[3] On appeal, the petitioner does not press any other complaints about trial counsel's ineffectiveness that had been raised below but not sustained by the evidence presented at the hearing.

probable outcome that he should have understood, and the sentence, it's because he didn't allow [counsel] to go into it with him.

And so my finding is that [counsel] – or any failure of [counsel] to meet the standard of a competent defense attorney in informing his client was because [the petitioner] wouldn't talk to him about it. And he couldn't make him talk to him about it.

As we shall explain, we affirm the post-conviction court's rejection of the petitioner's claim.

## II. Standard of Review: Ineffective Assistance of Counsel

A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). On appeal, the appellate court accords to the trial court's findings of fact the weight of a jury verdict, and those findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-89 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). Conclusions of law receive purely *de novo* review, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution both provide that a defendant in a criminal case is entitled to effective assistance of counsel. *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975). To make out a claim of ineffective assistance of counsel, the petitioner must show both that his counsel failed to perform at a level demanded of attorneys in criminal cases and that the deficient performance adversely affected the defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984); *Baxter*, 523 S.W.2d at 936. Should the petitioner fail to establish *either* deficient performance *or* resulting prejudice, he is not entitled to relief. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. On appeal, there is a strong presumption that the petitioner received satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

When reviewing an attorney's performance, courts do not "'second guess' tactical and strategic choices," nor do we "measure [the] defense attorney's representation by '20-20 hindsight.'" *Henley*, 960 S.W.2d at 579. We endeavor to eliminate "the distorting effects of hindsight . . . [and] evaluate the conduct from counsel's perspective at the time" of the conduct. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Simply stated, on appeal, there is a strong presumption that the petitioner received satisfactory representation. *Barr*, 910 S.W.2d at 464. On the other hand, our "deference to matters

of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *Goad*, 938 S.W.2d at 369.

### III.  Petitioner's Rejection of the Plea Offer

Although a defendant has no constitutionally protected interest or right to engage in plea bargaining, if the prosecution elects to open the bargaining process, the defendant is entitled to effective assistance of counsel in negotiations with the prosecution. *See Harris v. State*, 875 S.W.2d 662, 666 (Tenn. 1994). As with other ineffective assistance claims, the petitioner must demonstrate both deficient performance and prejudice. *See Hill v. Lockhart*, 474 U.S. 52, 57, 106 S. Ct. 366, 369-70 (1985).

The proposition that counsel's failure to communicate a plea offer to a client is professionally unreasonable and deficient was mortared into the law by the supreme court in *Harris v. State*, 875 S.W.2d 662 (Tenn. 1994). In that case, the defendant went to trial ignorant of a plea offer that the state had communicated to the defendant's counsel. *Id*. at 663. The defendant was convicted and sentenced to a prison term involving much more time than what the state had offered. *Id*. The court ruled that counsel's performance was deficient and concluded that prejudice existed inasmuch as the defendant's ignorance of the offer undermined confidence in the outcome of the prosecution. *Id*. at 665-66.

Six years after *Harris* was decided, the supreme court accepted review in a case with a fact pattern similar to *Harris* but distinguishable in one significant respect. In *State v. Garrison*, 40 S.W.3d 426 (Tenn. 2000), the defendant was convicted by a jury of solicitation to commit first-degree murder and was sentenced to serve sixteen years. *Id*. at 429. The defendant complained, via direct appeal and on a discretionary grant of Rule 11 review, that his trial counsel had failed to communicate to him a plea offer of ten years as a Range I offender to be served consecutively to other Knox County sentences. *Id*.

The state had conceded in *Garrison* that the plea offer had not been communicated to the defendant. The dispositive issue, therefore, focused on the required prejudice prong for proving ineffective assistance of counsel. The supreme court began by reciting the typical prejudice standard whereby a petitioner "must show that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial whose results are reliable." *Id.* at 431. The supreme court then explained why the "fair trial" standard did not apply.

> In cases where counsel did not convey a plea bargain offer to a defendant, however, the fair trial standard described above is not applicable. This inapplicability is obvious - the defendant may have received a fair trial, yet may have been prevented, by below-standard conduct of counsel, from avoiding trial altogether. Thus, a fair trial provides no remedy for counsel's pre-trial failures in this regard.

. . . In the context of a petitioner who seeks to reinstate (rather than withdraw) a plea offer, the petitioner must show that there is a reasonable probability that he or she would have accepted the plea had it been properly communicated to him or her.

*Id.*

The defendant Garrison was unable to make the necessary showing of prejudice. According to the supreme court, prejudice was not established because "the record include[d] testimony that when Garrison learned of the offer during jury deliberations, he indicated that he would not have accepted it, and the trial court apparently accredited that testimony." *Id.* Despite, therefore, the initial failure of Garrison's counsel to relay the offer, the supreme court concluded that "no reasonable probability" existed that counsel's failure "affected the outcome of the plea process." *Id.* at 432.

In the instant case, we are not dealing with counsel's failure to communicate a plea offer; all of the evidence establishes that the offer was conveyed to the petitioner in a timely fashion. The petitioner argues that the quality of the information provided by trial counsel was inadequate and that trial counsel should have pressed him to accept the offer, even to the point of threatening to withdraw from representation if the plea was not accepted. In this case, after hearing the proof, the post-conviction court found that although counsel attempted to discuss the plea offer with the petitioner, the petitioner refused to discuss the topic and became agitated whenever the plea was mentioned. The post-conviction court believed that the petitioner understood the charges that he was facing and understood that the state was offering a nine- or ten-year plea agreement. The petitioner's intransigent attitude, according to the post-conviction court, was rooted in his refusal to admit guilt to the aggravated robbery charge.

In our opinion, these findings, which are clearly supported by the evidence, eliminate the need to dissect each and every aspect of trial counsel's performance in connection with the plea offer. *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069 (courts need not consider the two components of *Strickland* analysis in a specific order or even address both components if petitioner makes insufficient showing on one). Much like the prejudice situation in *Garrison*, the petitioner's testimony in this case fails to establish by clear and convincing evidence that there is a reasonable probability that he would have accepted the state's offer had it been "properly" communicated to him. The petitioner variously testified that he refused to accept the plea offer because he had not committed a robbery, that he "probably would have took the ten years" had he known about his career offender status and the sentencing consequences, and that he would have pleaded guilty to "11/29" for simple assault, but nothing more. Inasmuch as the state never offered to allow the petitioner to plead guilty to simple assault and because the petitioner never produced any evidence suggesting that the state would have entertained any such compromise, we fail to see how the petitioner's present predicament is attributable to trial counsel's performance.

It cannot be gainsaid that accepting the state's offer was the most "objectively"

reasonable course for the petitioner to have pursued. Even so, "a defendant has the right to make a knowing, unwise decision." *Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). Mr. Costner attempted to characterize the petitioner as not terribly bright, and Mr. Costner testified at the post-conviction hearing that in his opinion the petitioner did not understand what he was facing in terms of the strength of the state's case, the likelihood of being convicted, and his sentencing exposure if convicted. We note, however, that even after Mr. Costner invested considerable time and energy in explaining these concepts to the petitioner, the petitioner, at the post-conviction hearing, remained evasive about his willingness to accept the state's offer. He claimed at one point that he "probably" would have accepted the offer had he understood the possible sentencing ramifications, but his unwillingness to commit to that decision simply reinforces the conclusion that the petitioner refused to discuss pleading guilty to aggravated robbery because, in his mind, all he did was get into a fight and assault the victim.

We are unwilling to declare that counsel, to be constitutionally effective, must pressure a reluctant client into accepting a favorable plea bargain. First, the adoption of a binding rule of representation is contrary to *Strickland*'s admonition that "[t]here are countless ways to provide effective assistance in any given case." 466 U.S. at 689, 104 S. Ct. at 2065. "Representation," simply stated, "is an art." *Id*. at 693, 104 S. Ct. at 2067. Furthermore, counsel has an obligation not to coerce a client into either accepting or rejecting a plea offer; the ultimate decision is for the client to make. *See Garrison*, 40 S.W.3d at 430 n.5 (the accused, not the lawyer, has the right to decide).

The petitioner in this case made his decision to go to trial. His decision was dictated by his insistence that he was not guilty of aggravated robbery. The petitioner refused to discuss the plea offer with trial counsel, and trial counsel could not force him to talk about it. The petitioner's plight, although regrettable, was preventable. For the reasons we have discussed, we hold that the petitioner has not proven ineffective assistance of counsel, and we affirm the post-conviction court's dismissal of the petition.

_____
JAMES CURWOOD WITT, JR., JUDGE